Timothy **HUTCHINSON**,
Plaintiff–Appellant,

v.

**UNITED STATES** of America,
Defendant–Appellee.

No. 89–15789.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 18, 1990.

Decided Oct. 2, 1990.

Daniel U. Smith, Kentfield, Cal., and Robert U. Bokelman, Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc., San Francisco, Cal., for plaintiff-appellant.

George Chris Stoll, Asst. U.S. Atty., San Francisco, Cal., for defendant-appellee.

Before CHOY, WIGGINS and LEAVY, Circuit Judges.

WIGGINS, Circuit Judge:

Timothy Hutchinson appeals the district court's judgment in favor of the United States in his medical malpractice action brought under the Federal Tort Claims Act. The district court found that Hutchinson failed to carry his burden of showing that a reasonably informed person in his situation would have withheld consent to the use of Prednisone, the drug administered to Hutchinson to alleviate his asthma but which caused aseptic necrosis in his hips. We have jurisdiction over this case under 28 U.S.C. § 1291 (1988). We reverse and remand for the computation of damages.

## BACKGROUND

On January 8, 1981, Hutchinson went to the emergency room at the United States Public Health Service hospital in San Francisco complaining of flu-like symptoms. Hutchinson was a chronic asthmatic, and the emergency room doctor determined that Hutchinson was suffering an asthma attack. The doctor admitted Hutchinson to the hospital and treated him with moderately conservative therapies consisting of epinephrine, aminophylline, and bronkosol.

On January 9, 1981, the doctor altered his treatment by decreasing the level of the above drugs and administering high doses of Prednisone, an anti-inflammatory steroid. Prednisone carries a risk of severe side effects, including aseptic necrosis of the femoral heads (collapse of the ball and socket hip joint) which is a crippling disease. However, no one at the hospital warned Hutchinson of this risk.

Hutchinson developed aseptic necrosis approximately one year after his treatment with Prednisone. As a result, Hutchinson has undergone seven hip surgeries and is facing the possibility of lifetime confinement to a wheelchair. Evidence presented by Hutchinson at a bench trial demonstrated that the Prednisone administered by the doctor was the proximate cause of his aseptic necrosis.

The district court initially rendered judgment against Hutchinson, finding that appellee's nondisclosure of the risk to Hutchinson was justified by evidence that Prednisone was commonly administered to asthma patients. This court reversed that judgment and remanded to the district court the questions: (1) whether the Government justified its nondisclosure of the risk to Hutchinson by showing that the risk was immaterial to his decision to consent to Prednisone treatment; and (2) if the risk was material, whether Hutchinson demonstrated that a reasonable person in his situation would have withheld consent to Prednisone treatment. *Hutchinson v. United States*, 841 F.2d 966, 967–68 (9th Cir.1988).

On remand, the district court found that the Government failed to show that the risk of developing aseptic necrosis was immaterial to Hutchinson's decision to consent to Prednisone treatment. The court held, therefore, that the Government failed to justify its nondisclosure of the risk to Hutchinson. The court ruled in favor of the Government, however, finding that Hutchinson failed to show that a reasonable person in his situation would have withheld consent to the treatment. Hutchinson timely appealed.

## STANDARD OF REVIEW

The conclusion to the question whether a reasonable person would have consented to Prednisone treatment in a given situation is determined by the district court's findings of fact. Thus, the clearly erroneous standard of review is appropriate. *See United States v. McConney*, 728 F.2d 1195, 1204

(9th Cir.) (en banc) (because judging whether certain conduct is negligent requires reviewing court to determine whether a person acted reasonably by community standards, the trial court's findings of fact essentially determine the legal conclusion and therefore the clearly erroneous standard is appropriate), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## DISCUSSION

■ On the evidence presented at trial, the district court found the general risk of developing aseptic necrosis from Prednisone to be substantial, and estimated the risk at fifteen to twenty-five percent. However, the district court ruled against Hutchinson because it concluded that he failed to show a substantial risk of developing aseptic necrosis in chronic asthmatics suffering severe asthma attacks. The court stated that:

> Plaintiff's contention that the Prednisone treatment he received posed a known and substantial risk of harm to him in particular, however, is not borne out by the evidence. Although plaintiff could have offered testimony regarding the rate of occurrence of aseptic necrosis in asthma patients who were similarly situated to the plaintiff and treated with Prednisone, he failed to do so. The court finds that, while a risk of developing aseptic necrosis exists in some circumstances of high-dosage Prednisone treatment, plaintiff failed to show the extent of the risk involved in the administration of Prednisone in this case.

This conclusion rests entirely upon the assumption that the risk of developing aseptic necrosis from Prednisone treatment is different for asthma patients than for others. Yet, our review of the record in this case, including extensive expert testimony presented by both parties, discloses no evidence which supports this assumption.

Dr. Genant testified that factors relevant to developing aseptic necrosis from Prednisone include the daily dosage of Prednisone, the total cumulative amount of Prednisone, the duration of treatment, and the patient's maximum pulse rate; Genant made no mention of the patient's underlying disease being a factor in the development of aseptic necrosis. Dr. Forberg testified that he believed that Prednisone caused Hutchinson's aseptic necrosis based on the daily and accumulated dosages of Prednisone, the relationship of use of Prednisone and development of aseptic necrosis, and the absence of other potential causes of the disease (like alcohol abuse); Forberg made no mention of asthma's being a factor to consider in the causation chain. Dr. Harrington testified that the risk of developing aseptic necrosis varies according to the dosage of Prednisone but made no mention of asthma or other underlying diseases as relevant to evaluating the risk.

On this record, the fact that Hutchinson was a chronic asthmatic suffering an asthma attack was irrelevant to the risk he faced from Prednisone treatment. The court accepted Hutchinson's evidence that the Prednisone treatment he received carried a significant risk of causing aseptic necrosis. Thus, the court's conclusion that Hutchinson failed to demonstrate a significant risk to a patient in his situation is clearly erroneous.

■ Given this significant risk, the question then is whether a reasonable person in Hutchinson's position would have consented to Prednisone treatment. The district court concluded that such a person would consent because it found that Hutchinson failed to show a viable alternative to Prednisone treatment for a person in his situation.

According to the evidence presented at trial, the goal of both conservative drugs and Prednisone is the same; both aim to stabilize the patient's asthma condition until the patient's own bodily functions can effectively combat the disease. Apparently, the benefit of Prednisone is that some patients will respond to it whereas they will not respond to the conservative drugs. However, at the time when Hutchinson would have been faced with the decision whether to consent to Prednisone treatment, the conservative drugs were already achieving relief for him. Hutchinson produced substantial and persuasive evidence,

which the district court accepted, that in the first twenty-four hours of hospitalization his asthma condition improved under conservative drugs without Prednisone. Dr. Dickensheet, who was at the time a hospital intern serving as Hutchinson's treating physician, acknowledged this improvement and admitted that the medical records did not indicate why he ordered Prednisone for Hutchinson at the end of that twenty-four hour period. At that point, therefore, Prednisone had no benefit to Hutchinson that the conservative drugs did not share.

On the other side of the coin, it is clear that the risks associated with Prednisone are far more severe than those associated with the doses of the conservative drugs to which Hutchinson was already responding. Hutchinson produced evidence that the conservative drugs in the doses he received carried only minimal risks of adverse side effects. The Government's experts stated that even conservative drugs can be dangerous if extremely high doses of the drugs are administered, but they never linked the dosage levels of the conservative drugs Hutchinson received to any significant danger. Hutchinson's experts, however, specifically linked the Prednisone dosages administered to Hutchinson to a significant risk of aseptic necrosis. Indeed, Dr. Forberg testified that in the face of Hutchinson's improvement under conservative therapies, administering the doses of Prednisone which Hutchinson received unjustifiably exposed him to severe side effects.

Hutchinson showed that in his situation continuation of conservative drugs was a viable and preferable alternative to Prednisone treatment, which carried a significant risk of causing aseptic necrosis. Under the particular facts of this case, we hold that it was clearly erroneous for the district court to conclude that a reasonable person in Hutchinson's position would consent to Prednisone treatment.

## CONCLUSION

We reverse the district court's judgment and remand for the entry of judgment in favor of Hutchinson, and the computation of damages.

REVERSED and REMANDED.